IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| JERRY WORD, | ) | |
| | ) | C/A No. 3: 05-2689-GRA |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **ORDER** |
| UNITED STATES PROBATION DEPARTMENT, | ) | (Written Opinion) |
| | ) | |
| Defendant. | ) | |

The plaintiff, Jerry Word, initiated this action alleging that the DNA Analysis Backlog Elimination Act of 2000, 42 U.S.C. § 14135b ("the DNA Act") violates the warrant requirement of the Fourth Amendment to the United States Constitution; violates the special needs exception to the warrant requirement in violation of the Fourth Amendment to the United States Constitution and violates the *Ex Post Facto* Clause of Article 1, Section 9 of the Constitution. Pursuant to Federal Rules of Civil Procedure 12(b)(6), Defendant filed a motion to dismiss this action. Plaintiff filed a response to Defendant's Motion to Dismiss and a hearing was held before this Court on June 26, 2006. For the reasons set forth below, this Court grants Defendant's motion.

## I. Background

### A. Statutory History

On December 19, 2000, Congress passed the DNA Act in an attempt to provide a database for identifying perpetrators of unsolved crimes. This DNA Act is codified as 42 U.S.C. § 14135a (2001) and has been amended twice. The DNA Act, as amended,

1

requires every convicted felon to provide a blood sample for submission into a database to be maintained by the Federal Bureau of Investigation ("FBI") regardless of the nature of the conviction.

The DNA Act requires individuals in custody and individuals on release, parole, or probation to give a DNA sample if they are, or have been, convicted of a qualifying federal offense. 42 U.S.C. § 14135a(a)(1), (2). The probation office is authorized by statute to collect DNA samples for those persons on release, parole or probation who have been convicted of any felony. 42 U.S.C.§ 14135a(a)(2), (d). With the passage of the DNA Act, Congress also amended the supervised release statute, requiring the giving of a DNA sample as an explicit condition of supervised release. 18 U.S.C. § 3583(d). In the case of an individual on supervised release, parole, or probation, the probation office responsible for the supervision of such individual must arrange for the collection of the DNA sample. 42 U.S.C.§ 14135a(a)(2). The probation office may use or authorize the use of such means as are reasonable necessary to detain, restrain, and collect a DNA sample from any individual who refuses to give a sample. 42 U.S.C. § 14135a(a)(4)(A). An individual who fails to give a DNA sample is guilty of a Class A misdemeanor. 42 U.S.C. § 14135a(a)(5).

By statute, once the collection facility obtains the DNA sample, it sends the completed test kit to the FBI laboratory for analysis and entry into the Combined DNA Index System ("CODIS"). 42 U.S.C. §14135a(c)(2), §§ 14132(a), 14135a(b); *see* H.R.

Rep. No. 106-900(I) (Sept. 26, 2000), 2000 WL 1420163, at *26-27. CODIS is an indexing system created by the FBI in response to the congressional passage of the Violent Crime Control and Law Enforcement Act, 42 U.S.C. §§ 13701-14223 (1994) ("Crime Control Act").

The DNA Act strictly limits the permissible uses of the DNA information obtained from the DNA test to be used only for purposes specified in the Crime Control Act. 42 U.S.C. § 14135e(b). The Crime Control Act limits the disclosure of the test results to criminal justice agencies for law enforcement identification purposes, for use in judicial proceedings, and for criminal defense purposes to a defendant. 42 U.S.C. § 14132(b)(3). The DNA Act penalizes the disclosure of the sample or result to a person without authorization to receive it or the obtaining of a sample or result without authorization. 42 U.S.C. § 14135e(c). In addition, the DNA Act provides for the expungement of DNA records from CODIS when a conviction for a qualifying offense is overturned. 42 U.S.C. § 14132(d).

The DNA information in CODIS serves as the "genetic fingerprint" of the offender or unidentified individual; it is specifically designed not to convey any other information about the person, such as physical or medical characteristics. *See* H.R. Rep. No. 106-900(I), at *25, *27. The main purpose of the DNA Act is to assist federal, state, and local law enforcement authorities in solving past and future crimes, by "authorizing collection, analysis, and indexing of DNA samples from persons convicted of Federal crimes . . ."

*Id*. at *8.

## B. Factual Background

On May 16, 1997, the plaintiff, Jerry Word, was convicted in the Eastern District of Michigan as a Felon in Possession of a Firearm pursuant to Title 18 U.S.C. §922(g)(1). The plaintiff was sentenced to ten years confinement and three years Supervised Release on September 10, 1997. On March 8, 2005, the plaintiff was released from custody and placed on supervised release in the District of South Carolina.

Pursuant to the DNA Act, the plaintiff was ordered by the United States Probation Office, District of South Carolina to report to the office to submit a blood sample for inclusion in CODIS. *See* Amended Compl. ¶ 9. The plaintiff objected to the request to provide a DNA sample. *Id*. ¶ 10. On September 16, 2005, the plaintiff filed a *pro se* petition seeking a temporary restraining order ("TRO") to prevent the defendants from requiring that he provide a DNA sample. *Id.* ¶ 13. On September 21, 2005, the Court filed an Order recommending denial of the TRO and Preliminary Injunction. *Id*.¶ 14. Two days later, The plaintiff appeared at the United States Probation Department to provide the blood sample, but officials refrained pending the resolution of this case. *Id*. ¶ 15.

## II. Standards of Review

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court must construe the

4

allegations and facts in the complaint in the light most favorable to the plaintiff and must grant the plaintiff the benefit of all inferences that can be derived from the alleged facts. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (citing *Kowal v. MCI Communications Corp.*, 16 *85 F.3d 1271, 1276 (D.C. Cir.1994)). However, the Court need not accept inferences or conclusory allegations that are unsupported by the facts set forth in the complaint. *Kowal*, 16 F.3d at 1276. In deciding whether to dismiss a claim under Rule 12(b)(6), the Court can only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference into the complaint, and matters about which the Court may take judicial notice. *E.E.O.C. v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624-25 (D.C. Cir. 1997). The Court will dismiss a claim pursuant to Rule 12(b)(6) only if the defendant can demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45-46, 78 S.Ct. 99.

### III. Legal Analysis

The plaintiff's complaint sets forth three causes of action. Amended Compl. ¶¶ 16-40. These claims assert that it is illegal to demand the plaintiff's DNA while he was on probation, because the Government's use of the DNA Act (1) deprives the plaintiff of his Fourth Amendment protection from unreasonable searches and seizure by violating the warrant requirement, (2) fails to "fit within the special needs exception to the warrant

requirement," and (3) violates the *Ex Post Facto* Clause of the United States Constitution, as applied to the plaintiff.

The Court begins its analysis by discussing whether the DNA Act violates any constitutional or statutory rights of the plaintiff.

### A. Fourth Amendment Claim

The plaintiff first contends that the DNA Act violates the Fourth Amendment's guarantee to be free from unreasonable searches and seizures. "The Courts has [sic] found this generally means an individual cannot be searched absent a warrant based upon probable cause." Amended Compl. ¶ 17. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. It is not disputed that the involuntary taking of a DNA sample constitutes a search under the Fourth Amendment. *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 618, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) ("the collection and subsequent analysis of the requisite biological samples must be deemed Fourth Amendment searches"). Moreover, it is undisputed that a warrant was never issued requiring the plaintiff to provide a DNA sample.

It is undisputed that the Act allows the government to withdraw blood samples

6

from qualified offenders without a warrant, probable cause, or even individualized suspicion. It is undisputed that plaintiff is a qualified offender. Moreover, it is undisputed that taking a blood sample constitutes a search under the Fourth Amendment. *See Skinner*, 489 U.S. at 616; *Schmerber v. California*, 384 U.S. 757, 76-68, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Nonetheless, "the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." *Skinner*, 489 U.S. at 619, 109 S.Ct. 1402.

This Court is bound by the Fourth Circuit's opinion in *Jones v. Murray*, 962 F.2d 302 (4th Cir. 1992), *cert. denied*, 506 U.S. 977, 121 L.Ed. 2d 378, 113 S. Ct. 472 (1992). "In *Jones,* the Fourth Circuit upheld the constitutionality of a Virginia statute requiring incarcerated felons to provide the Commonwealth with a blood sample for DNA analysis and storage." *See* 962 F.2d at 304. The court noted that "when a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it." *Id*. at 306. Thus, the court concluded that "the Fourth Amendment does not require an additional finding of individualized suspicion before blood can be taken from incarcerated felons for the purpose of identifying them." *Id*. at 306-07. Weighing the "minor intrusion" of obtaining a blood sample against the governmental interest "in preserving a permanent identification record of convicted felons for resolving past and future crimes," the Fourth Circuit upheld the DNA collection requirement as reasonable under the Fourth Amendment. *See id*. at 307.

7

"Ultimately, *Jones* is not distinguishable and therefore controls this court's decision." *U.S. v. Stegman*, 295 F.Supp. 2d 542 , 548-49 (D.Md. 2003).

The Courts of Appeals that have considered the constitutionality of compelled DNA testing under the Fourth Amendment have differed over how to analyze the reasonableness of the search involved. *See Nicholas v. Goord*, 430 F.3d 652, 659 (2nd Cir. 2005) (compiling methods used by different Circuits in deciding DNA testing cases). The two options between which Courts of Appeals have chosen are the special needs test first outlined by Justice Blackmun in his concurrence in *New Jersey v. T.L.O.*, 469 U.S. 325, 351, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (Blackmun, J., concurring), and the general Fourth Amendment balancing test that weighs the interests of the government against those of the individual. *See Nicholas*, 430 F.3d at 659 (stating that "[t]he Second, Seventh, and Tenth Circuits have applied the special-needs test [and the] Third, Fourth, Fifth, Ninth, and Eleventh Circuits have applied a general balancing test").  The courts are split as to whether to apply the reasonableness standard of *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) or the "special needs" exception of *Griffin v. Wisconsin*, 843 U.S. 868 (1987) to uphold the constitutionality of the DNA Act.

"The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Knights*, 534 U.S. at

118-19 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)).  The Fourth Circuit has opted for the balancing test. Thus, to determine the plaintiff's privacy interests implicated by the search, the Court must balance the plaintiff's privacy interest against the public interests served by acquiring the sample.

Under a Fourth Amendment reasonableness standard for analyzing the constitutionality of government searches and seizures, the collection of DNA samples from individuals on supervised release is constitutional. *See United States v. Sczubelek*, 402 F.3d 175 (3rd Cir. 2005).  In *United States v. Sczubelek*, the Third Circuit evaluated the constitutionality of the former version of the DNA Act, as applied to a convicted bank robber who refused to provide a DNA sample while on supervised release. 402 F.3d at 176-77. The Circuit Court began its analysis by reviewing the Supreme Court's only precedents involving warrantless probationary searches, *Griffin v. Wisconsin*, 483 U.S. 868 (1987), and *United States v. Knights*, 534 U.S. 112 (2001).

In *Griffin*, the Supreme Court upheld a warrantless search of a probationer's home that was conducted by a probation officer pursuant to a state regulation that permitted such searches where there were "reasonable grounds" to believe that contraband was present. The search at issue produced a gun that later served as the basis for the probationer's state court conviction for a firearms offense. 483 U.S. at 870-71. As the *Sczubelek* court noted, the Supreme Court's decision in *Griffin* "rested in part on the distinction between searches conducted by probation officers and investigative searches

conducted by law enforcement officers." 402 F.3d at 183.  The Supreme Court in *Griffin* expressly held that "[a] State's operation of a probation system . . . presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." 483 U.S. at 873-74 (referring to the "special needs" doctrine first articulated by Justice Blackmun in his concurring opinion in *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring)).

Applying the "special needs" doctrine to the probationary search at issue in *Griffin*, the Supreme Court first noted that "[t]o a greater or lesser degree, it is always true of probationers . . . that they do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." 483 U.S. at 874 (internal quotation marks and citation omitted) (brackets added by the Court). The Court then found that imposing a warrant or probable cause requirement on probationary searches under the Wisconsin regulation would interfere with the goals of probation by "mak[ing] it more difficult for probation officials to respond quickly to evidence of misconduct" and by "reduc[ing] the deterrent effect that the possibility of expeditious searches would otherwise create." *Id*. at 875, 878. Finally, the Court emphasized that "it is the very assumption of the institution of probation that the probationer is in need of rehabilitation and is more likely than the ordinary citizen to violate the law." *Id*. at 880.  Balancing these factors, the Court concluded that the search

in *Griffin* "was 'reasonable' within the meaning of the Fourth Amendment because it was conducted pursuant to a valid regulation governing probationers." *Id*.

The issue of whether a warrantless probationary search violated the Fourth Amendment was raised again in *Knights*, in which the Supreme Court upheld a warrantless search of a probationer's apartment that was supported by reasonable suspicion and authorized by a condition of his probation. 534 U.S. 112 (2001). As the Third Circuit noted in *Sczubelek*, 402 F.3d at 184, the search in *Knights* "was by the police in connection with the investigation of a crime, rather than a search by a probation officer performing his supervisory duties." *Sczubelek*, 402 F.3d at 183. The search produced evidence that was used to indict the probationer on arson, explosives, and weapons charges. *Knights*, 534 U.S. at 115-16. In evaluating the constitutionality of the search, the Supreme Court "examin[ed] the totality of the circumstances" and balanced "the degree to which [the search] intrudes upon an individual's privacy" against "the degree to which it is needed for the promotion of legitimate governmental interests." *Id*. at 118-19. Central to the Court's analysis was Knights' "status as a probationer," which "informs both sides of that balance." *Id*. at 119.

The Court began its analysis in *Knights* by evaluating the probationer's privacy interest. The Court reiterated its finding in *Griffin* that probationers "do not enjoy the absolute liberty to which every citizen is entitled," and expressly held that "a court granting probation may impose reasonable conditions that deprive the offender of some

11

freedoms enjoyed by law-abiding citizens." *Knights*, 534 U.S. at 119 (internal quotation marks and citations omitted). The Court concluded that Knights had a "significantly diminished" expectation of privacy. *Id.* at 119-20.

The Court then turned to "the governmental interest side of the balance," emphasizing that "the very assumption" of probation is that the probationer "is more likely than the ordinary citizen to violate the law." 534 U.S. at 120 (quoting *Griffin*, 483 U.S. 880). As the Court noted, "[t]he recidivism rate of probationers is significantly higher than the general crime rate." *Id.* (citing reports). Given this recidivism problem, the Court acknowledged the State's "quite justified" concern that probationers "will be more likely to engage in criminal conduct than an ordinary member of the community." *Id.* at 121. The Court further noted that "probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal." *Id.* at 120. The Court then explained that, under the Fourth Amendment, the State's "interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen." *Id.* at 121. Balancing the competing interests at stake in *Knights*, the Court concluded that "the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house." *Id.* The Court specifically noted, however, that it was not addressing the constitutionality of a suspicionless search. *Id.* at 120 n.6; *see also*

*Sczubelek*, 402 F.3d at 186 (explaining that *Knights* "does not establish the constitutional floor below which searches are unconstitutional").[1]

On June 19, 2006, the Supreme Court rendered a decision in *Samson v. California*, ____ U.S. ____, 126 S.Ct. 2193, 2196 (2006), to answer "a variation of the question this Court left open in *United States v. Knights*, . . . whether a condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment." The Court answered that question in the affirmative. *Samson* involved a California law that provides for every prisoner eligible for release on state parole "shall agree in writing to be subject to search or seizure by a parole office or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." Cal. Penal Code Ann. §3067(a) (West 2000). *Samson*, 126 S.Ct. at 2196. Samson was stopped and searched solely on the basis of his status as a parolee, and was later convicted of a drug offense. He challenged the validity of the parole search.

Justice Thomas, writing for the Court, explained that when determining the reasonableness of a search under the Fourth Amendment, the Court examines the totality

---

[1]     It should also be noted that in both *Griffin* and *Knights*, the search was of the probationer's *home*, which the Supreme Court has explained lies at "the very core" of the Fourth Amendment. *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)); *see also United States v. United States Dist. Court for Eastern District of Mich.*, 407 U.S. 297, 313 (1972) (characterizing entry into the home as "the chief evil against which the wording of the Fourth Amendment is directed"). The Court is unaware of any case in which the Supreme Court has held that a criminal offender's *identity* is protected by the Fourth Amendment.

of the circumstances, balancing the degree to which a search intrudes upon an individual's privacy against the degree to which the search is needed for the promotion of legitimate governmental interests. *Id*. at 2197, citing *Knights*, 534 U.S. at 118-119.   The Court noted that "California's ability to conduct suspicionless searches of parolees serves its interest in reducing recidivism, in a manner that aids, rather than hinders, the re-intergration of parolees into productive society." *Id*. at 2200. "The touchstone of the Fourth Amendment is reasonableness, not individualized suspicion." *Id*. at 2201, fn. 4.

In addressing the reasonableness of the parolee search at issue, Justice Thomas found that, under the totality of the circumstances, "the petitioner did not have an expectation of privacy that society would recognize as legitimate." *Id*. at 2199.   The Court went on to address the societal concerns regarding persons of probationers and parolees.   "This Court concluded that the incentive-to-conceal concern justified an 'intensive' system for supervising probationers in *Griffin*, 483 U.S. at 875, 107 S.Ct. 3164.   That concern applies with even greater force to a system of supervising parolees. See *United States v. Reyes*, 283 F.3d at 461 (observing that the *Griffin* rationale 'appl[ies] *a fortiori*' to 'federal supervised release, which, in contrast to probation, is 'meted out in addition to, not in lieu of, incarceration''')." *Id*. at 2201.   The Court concluded that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Id*. at 2202.   *Samson* supports the Court's decision in the instant case as the DNA Act serves the same legitimate governmental interests espoused *Samson*.

The Third Circuit in *Sczubelek* followed the "totality of the circumstances" balancing approach used by the Supreme Court in *Knights* in evaluating the constitutionality of the DNA Act. *Sczubelek*, 402 F.3d at 184. The *Sczubelek* court did not apply the "special needs" rationale from *Griffin* because it found that the purpose of the DNA Act "goes well beyond the supervision by the probation office of an individual on supervised release, as was the situation in *Griffin*." *Id.*

In applying the *Knights* balancing test to the DNA Act, the *Sczubelek* court first found that "the intrusion of the blood test is minimal." *Sczubelek*, 402 F.3d at 184. While this "slight intrusion" would be unconstitutional if imposed on an ordinary citizen, the Circuit Court emphasized that "an individual on supervised release has a reduced right to privacy – and in particular to privacy of identity." *Id.* The court noted that when Sczubelek was arrested, he was photographed and fingerprinted. *Id.* The court then explained that "[a]fter his conviction of a felony, his identity became a matter of compelling interest to the government, and these marks of identification, the fingerprints and the photographs, became a permanent record." *Id.* Because DNA provides "a further – and in fact more reliable – means of identification," the Third Circuit concluded that "the privacy interests implicated by the collection of DNA are minimal." *Id.* at 184-85.

On the governmental interest side of the balance, the *Sczubelek* court agreed that the government "has a compelling interest in the collection of identifying information of criminal offenders." 402 F.3d at 185. The court noted the tremendous value of DNA in

"promot[ing] increased accuracy in the investigation and prosecution of criminal cases," as well as the "[e]qually important" ability of DNA "to exculpate individuals who are serving sentences of imprisonment for crimes they did not commit." *Id.* The court then explained that "[t]he governmental justification for this form of identification . . . relies on no argument different in kind from that traditionally advanced for taking fingerprints and photographs, but with additional force because of the potentially greater precision of DNA sampling and matching methods." *Id.* at 185-86 (quoting *Jones v. Murray*, 962 F.2d 302, 307 (4th Cir. 1992)). The *Sczubelek* court also agreed that the government has a legitimate interest in promoting "the two primary goals of probation – rehabilitation and protecting society from future criminal violations." *Id.* at 186 (quoting *Knights*, 534 U.S. at 119). After noting that "individuals on supervised release are associated with higher recidivism rates," the court found that the DNA Act promotes these goals "by deterring [probationers] from committing crimes in the future." *Id.*

Balancing the "compelling" public interests served by the DNA Act against the "slight intrusion" occasioned by giving a blood sample and the probationer's "minimal" privacy interest in his identity, the *Sczubelek* court held that the DNA Act does not violate the Fourth Amendment, and that the Fourth Amendment does not require any additional individualized suspicion to take a blood sample for DNA identification purposes from a convicted criminal offender. *Sczubelek*, 402 F.3d at 186-87.

16

In reaching this conclusion, the court also considered certain "other factors" about the DNA Act, including the lack of discretion given to probation officers to decide who is required to give a DNA sample; the restrictions placed on the uses of the DNA information; the criminal penalties for unauthorized disclosure of the DNA information; and the provision for expunging the DNA information from CODIS in the event that an offender's qualifying convictions are overturned. *Id.* at 187.

The reasoning in *Sczubelek* is applicable in the instant case. Although the decision in *Sczubelek* (and in the DNA Act cases that preceded it) upheld the former version of the DNA Act, which did not extend to persons convicted of "[a]ny felony," the constitutionality of the current version of the DNA Act was recently affirmed by the Eleventh Circuit in *United States v. Castillo-Lagos*, 2005 WL 2033641 (11th Cir. Aug. 24, 2005) (slip op.) (per curiam), and by the Southern District of Iowa in *United States v. Bracy*, 2005 WL 1083212 (S.D. Iowa Apr. 14, 2005) (slip op.).

In *Castillo-Lagos*, the defendant appealed his sentence after pleading guilty to one count of illegal re-entry after deportation, 18 U.S.C. § 1326. 2005 WL 2033641, at *1. He argued that the district court's requirement that he cooperate with the government in providing a DNA sample pursuant to the DNA Act violated his Fourth Amendment right to be free from unreasonable searches and seizures. *Id.* The Eleventh Circuit rejected his argument, based on its previous decision in *Padgett v. Donald*, 401 F.3d 1273 (11th Cir. 2005), which upheld the constitutionality of Georgia's analogous DNA profiling statute.

17

*Id.* at *3.  The Georgia statute requires all convicted, incarcerated felons to provide a DNA sample for analysis and storage in a databank maintained by the Georgia Bureau of Investigation.  *Padgett*, 401 F.3d at 1275.  The DNA samples are obtained by swabbing the inside of felons' mouths for saliva.  *Id.*

In *Padgett*, the Eleventh Circuit applied the *Knights* "totality of the circumstances" balancing test in affirming the constitutionality of the Georgia DNA profiling statute under the Fourth Amendment.  *Padgett*, 401 F.3d at 1279-80.  Although the court noted that prisoners "do not forfeit all constitutional protections by reason of their conviction and confinement in prison," *Id.* at 1278 (quoting *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)), it emphasized that "they do not enjoy the same Fourth Amendment rights as free persons." *Id.*  Among other intrusions to which prisoners must submit are "routine tests of their blood, hair, urine, or saliva for drugs." *Id.* (citation omitted).  Consequently, the court found that the swabbing required to obtain saliva for a DNA sample was a "minor intrusion." *Id.* at 1280.  The court also found that the prisoners had a "reduced expectation of privacy in their identities." *Id.*  Finally, the court concluded that the prisoners' privacy interests were outweighed by Georgia's "legitimate interest in creating a permanent identification record of convicted felons for law enforcement purposes." *Id.* (citing *Jones*, 962 F.2d at 306-8).  Because "no meaningful distinction" exists between the Georgia DNA profiling statute upheld in *Padgett* and the federal DNA Act, the

Eleventh Circuit in *Castillo-Lagos* concluded that the same finding of constitutionality must obtain with respect to the DNA Act. *Castillo-Lagos*, 2005 WL 2033641, at *3.[2]

The district court in *Bracy* also applied the *Knights* "totality of the circumstances" balancing test in evaluating the constitutionality of the current version of the DNA Act. 2005 WL 1083212, at *2. The defendant in *Bracy* had been convicted on his guilty plea of conspiracy to distribute methamphetamine, and sentenced to 50 months imprisonment and 60 months of supervised release. *Id.* at *1. While on supervised release, he refused to provide a DNA sample as directed by his probation officer, and a motion was brought by the Probation Department to compel his cooperation. *Id.* The defendant argued in opposition to the motion that the "coerced collection of a sample of his blood for

---

[2] At least 24 states have passed laws requiring the collection of DNA samples from all felons. *See* Ala. Code § 36-18-24; Ariz. Rev. Stat. Ann. § 13-610; Colo. Rev. Stat. § 17-2-201(5)(g)(I); Del. Code Ann. tit. 29, § 4713(b); Fla. Stat. Ann. § 943.325; Ga. Code Ann. § 24-4-60; 730 Ill. Ann. Stat. 5/5-4-3; Iowa Code Ann. § 902.13; Kan. Stat. Ann. § 21-2511; Me. Rev. Stat. Ann. tit. 25, § 1574; Md. Code Ann., art. 88B § 12A; Mich. Comp. Laws Ann. § 28.176; Minn. Stat. Ann. § 609.119; Mont. Code Ann. § 44-6-102; N.M. Stat. Ann. § 29-16-3; Or. Rev. Stat. §§ 137.076 and 181.085; Tenn. Code Ann. §§ 40-35-321(d)(1) and (2); Tex. Code Ann. § 411.148; Utah Code Ann. 53-10-403; Va. Code Ann. § 19.2- 310.2; Wash. Rev. Code § 43.43.754; Wis. Stat. Ann. § 165.76; Wy. Stat. § 7-19-403. In addition to *Castillo-Lagos*, *supra*, the following federal and state court decisions have upheld the constitutionality under the Fourth Amendment of these "all felon" state DNA statutes: *Green v. Berge*, 354 F.3d 675 (7th Cir. 2004) (Wisconsin statute); *Velasquez v. Woods*, 329 F.3d 420 (5th Cir. 2003) (per curiam) (Texas statute); *Jones v. Murray*, 962 F.2d 302 (4th Cir. 1992) (Virginia statute); *Sterson v. Doe*, 2004 WL 1630500 (N.D. Ill. Jun. 2, 2004) (Illinois statute); *State v. Surge*, 94 P.3d 345 (Wash. App. 2004); *People v. Garvin*, 812 N.E.2d 773 (Ill. App. 2004); *State v. Maass*, 64 P.3d 382 (Kan. App. 2003); *D.B. v. State*, 861 So.2d 4 (Ala. Crim. App. 2003); *Doles v. State*, 994 P.2d 315 (Wy. 1999). The Court is unaware of any of these statutes being declared unconstitutional by any federal court or state appellate court.

inclusion in the CODIS database . . . would constitute an unreasonable search and seizure." *Id.* The district court disagreed. The district court first noted that, "as a convicted felon on supervised release, Defendant has a diminished expectation of privacy." *Id.* at *3 (citing *Griffin*, 483 U.S. at 874, and other cases). More specifically, the court found that the defendant "has no legitimate expectation of privacy in proof of his identity as a convicted offender." *Id.* (citations omitted). Next, the court found that "the intrusion of extracting the blood sample is minimal." *Id.* (citing *Winston v. Lee*, 470 U.S. 753, 762 (1985) ("blood tests do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity"), and other cases). Against "this minimal intrusion and diminished expectation of privacy" on the part of the defendant, the court weighed the "compelling" public interests served by the DNA Act: combating recidivism "by solving crimes and removing dangerous offenders from the streets"; and "reduc[ing] the incidence of injustice in the criminal justice system" by identifying the true perpetrators of crimes and exonerating persons who have been wrongly accused or convicted. *Id.* at *4. Finally, the court noted that the DNA Act is "narrowly tailored," with no discretion as to whom is profiled, and with strict limitations on the use of the DNA information gathered. *Id.* Balancing these various factors, the court noted "the huge benefit to society in comparison to the small inconvenience to Defendant, and the essential reasonableness of the proposed DNA collection," and held that the DNA Act does not violate the Fourth Amendment. *Id.* The overwhelming weight of federal

20

judicial authority has expressly and consistently affirmed the constitutionality of the DNA Act (and analogous state laws) under the Fourth Amendment. These decisions are indistinguishable from the case at bar.

The DNA Act prohibits the use of an offender's DNA sample for anything other than "law enforcement identification purposes," and mandates criminal penalties for any violations. 42 U.S.C. §§ 14132(b)(3), 14135e [C]. There is nothing in the DNA Act, and no evidence to suggest, that offenders' DNA samples will be used improperly. Furthermore, the statutory text suggests the DNA Act was enacted, in part, to facilitate DNA-based exonerations. *See* 42 U.S.C. § 14132(b)(3)[C]. *See Johnson v. Quander*, 440 F.3d 489, 502 (D.C. Ct. of Appeals, 2006). Thus, Word's challenge to the DNA Act's constitutionality fails.

In resolving a facial challenge to the constitutionality of a statute under the Fourth Amendment, the Supreme Court "will not assume the worst." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 660 (1995); *see also Skinner*, 489 U.S. at 632 n.10 ("While it is impossible to guarantee that no mistakes will ever be made in isolated cases, respondents have challenged the administrative scheme on its face. We deal, therefore, with whether the tests contemplated by the regulations can *ever* be conducted") (emphasis in original); *cf. United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid").

Accordingly, in evaluating the constitutionality of the DNA Act, this Court does not credit Plaintiff's unsubstantiated fears that his DNA sample will be analyzed for anything other than his identifying profile. Acts passed by Congress enjoy a rebuttable presumption of constitutionality. *U.S. v. Booker*, 543 U.S. 220, 274 (2005), citing *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984). Plaintiff has not rebutted the presumption of constitutionality.

In view of the foregoing, the Court finds that no Fourth Amendment violation has occurred. The government interests furthered by the DNA Act outweigh the plaintiff's substantially diminished expectations of privacy and the minimal intrusion of a blood sample are reasonable under the totality of the circumstances.

### B. *Ex Post Facto* Challenge

Plaintiff also alleges that application of the DNA Act to him violates the *Ex Post Facto* Clause in that his only special condition of probation was to participate in an approved substance abuse program and there was no mention of the DNA Act. Amended Compl. ¶¶ 33 and 36. Plaintiff also contends that "the provisions of the DNA Act authorizing the use of 'such means as are reasonably necessary to detain, restrain, and collect a sample' 42 U.S.C. §14135a, allow additional punishment to be imposed against parolees. Furthermore, Officer Salley's threat to have Plaintiff's release revoked constituted an additional punishment not included in his original sentence." Amended Compl. ¶¶ 38-39.

22

The Court finds that no *ex post facto* violation has occurred. While the *Ex Post Facto* Clause provides simply and without explanation, "No State shall ... pass any ... *ex post facto* Law," U.S. Const. Art. I, § 10, cl. 1, the clause's definition is nevertheless settled. *See Jones v. Murray,* 962 F.2d 309 (quoting *Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990)). The prohibition against *ex post facto* laws, which "applies only to penal statutes which disadvantage the offender affected by them," *Collins,* 110 S.Ct. at 2718, assures that innocent conduct is not made criminal after the fact and that greater punishment is not imposed after the fact. *See Weaver v. Graham*, 450 U.S. 24, 28, 101 S.Ct. 960, 963, 67 L.Ed.2d 17 (1981). A statute that is not penal cannot be *ex post facto.* Thus, it cannot be said that the DNA testing, itself, runs afoul of the *Ex Post Facto* Clause. *See Jones*, 962 F.2d. 309. In this Circuit, requiring prisoners to provide blood samples for DNA testing has been held not to be punitive and not, in itself, a violation of the *Ex Post Facto* Clause. *Id.; see also Johnson v. Quander*, 370 F.Supp.2d 79, 96-97 (D.D.C. 2005); *Ewell v. Murray*, 11 F.3d 482, 485-86 (4th Cir.1993). Several other courts similarly have held that the federal DNA Act is not *ex post facto,* because it is not penal and thus does not impose additional punishment for a prior offense. *See Vore v. U.S. Dep't of Justice*, 281 F.Supp.2d 1129, 1138 (D.Ariz.2003), (noting that "[t]he DNA Act is not designed to punish those who have already been convicted."); *Miller v. U.S. Parole Comm'n*, 259 F.Supp.2d 1166, 1172 (D.Kan. 2003); *Sczubelek*, 255 F.Supp.2d at 325; *United States v. Reynard*, 220

23

F.Supp.2d 1142, 1160 (S.D.Cal. 2002) (explaining that "[t]he legislative history of the DNA Act demonstrates that Congress did not create the Act as a means for punishing qualifying offenders for past convictions").

As pointed out in *U.S. v. Stegman,* 295 F.Supp.2d 542, 547-48 (D.Md. 2003), "a potential misdemeanor conviction for failure to cooperate does not increase Stegman's punishment for the 1997 firearms conviction.  The DNA Act criminalizes Stegman's March 2002 failure to comply with the previously enacted DNA Act. Thus, if Stegman is convicted of a misdemeanor pursuant to 42 U.S.C. § 14135a(a)(5), the conviction will criminalize a new act (or omission) rather than increase the punishment for an old act. *See Vore*, 281 F.Supp.2d at 1138;  *Miller*, 259 F.Supp.2d at 1171;  *Sczubelek*, 255 F.Supp.2d at 325; *Reynard*, 220 F.Supp.2d at 1161."

The same is true in the plaintiff's case.  The penalty for the plaintiff's firearms offense has not been increased from "whatever the law provided when he acted" and the DNA Act criminalizes the plaintiff's current failure to comply with the DNA Act.  Any resulting punishment would be for a new act (or omission) rather than an increase in punishment for his firearms conviction.

As further pointed out in *Stegman*, 295 F.Supp.2d 542, 547 (D.Md. 2003), the potential revocation of supervised release does not increase the plaintiff's  punishment for a prior conviction.  As part of the original sentence, the plaintiff was subject to a mandatory condition of supervised release that he "not commit another Federal, State, or

24

local crime." *Id.; see also* 18 U.S.C. § 3583(d). Like Stegman, Word was subject to a condition that he "follow the instructions of the probation officer." *See* Standard Conditions of Supervision, Item 3.  Thus, the  relevant conditions of supervised release were part of the original sentence and have not been altered.  *See United States v. Evans*, 159 F.3d 908, 913 (4th Cir.1998) ("[T]he term of supervised release, the revocation of that term, and any additional term of imprisonment imposed for violating the terms of the supervised release are all part of the original sentence.");  *see also Miller v. U.S. Parole Comm'n*, 259 F.Supp.2d 1166, 1170 (D.Kan.2003) (noting that revocation of supervised release for failure to comply with the DNA Act is part of a probationer's original sentence, and thus does not constitute new punishment).

Accordingly, the penalty for Word's initial offense has not been increased.  He merely faces new criminal action if he  refuses to submit to DNA testing. *Johnson*, 529 U.S. at 699, 120 S.Ct. 1795.

Likewise, no *ex post facto* violation occurs because whatever disadvantage is imposed from an inmate's refusal to comply with the DNA Act results "not by reason of conduct that took place before enactment of the statute, so as to become retrospective, but from conduct that occurred after enactment in refusing to comply with a reasonable regulation." *Jones*, 962 F.2d at 309,  n. 3 (holding that retention of inmates who refused to provide blood for a DNA sample was not an *ex post facto* law since that retention did not exceed the terms of the prisoners' initial sentences).

Finally, the Supreme Court has held that the revocation of probation does not constitute a "punishment" for purposes of the *Ex Post Facto* Clause. *See Johnson v. United States*, 529 U.S. 694, 700-01, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000). As applied to the plaintiff, there has been no *ex post facto* violation.

Accordingly, the forced extraction of DNA from the plaintiff is not penal, does not increase his punishment for his prior conviction, and thus, does not violate the *ex post facto* Clause.

### IV. Conclusion

The DNA Act, as applied to the plaintiff, does not violate the Fourth Amendment nor the *Ex Post Facto* Clause of the United States Constitution.

IT IS THEREFORE ORDERED that Defendant's Motion to Dismiss be GRANTED and this case be hereby DISMISSED.

IT IS SO ORDERED.

G. ROSS ANDERSON, JR.
UNITED STATES DISTRICT JUDGE

Anderson, South Carolina

July  13  , 2006.

26